hmg

U.S. Department of Justice

*United States Attorney*
*District of Maryland*
*Northern Division*

___ FILED     ___ ENTERED
___ LOGGED   ___ RECEIVED

3:15 pm, Sep 11 2023
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

*Christine Goo*
*Assistant United States Attorney*
*Christine.Goo@usdoj.gov*

*Mailing Address:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*Office Location:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

DIRECT: 410-209-4924
MAIN: 410-209-4800

June 20, 2023

Sedira Banan
Federal Public Defender for the District of Maryland
100 S. Charles St # 900,
Baltimore, MD 21201

      Re:    United States v. Steven Angelini,
               Criminal No. ELH-22-249

Dear Counsel:

      This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Steven Angelini (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by July 6, 2023, it will be deemed withdrawn. The terms of the Agreement are as follows:

## Offense(s) of Conviction

      1.    The Defendant agrees to plead guilty to Counts 1 and 3 of the Indictment, which charge the Defendant with Conspiracy to Distribute and Possession with the Intent to Distribute Controlled Dangerous Substances and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 924(c). The Defendant admits that the Defendant is, in fact, guilty of these offenses and will so advise the Court.

## Elements of the Offense(s)

      2.    The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

***Count 1- Conspiracy to Distribute and Possess with the intent to Distribute Oxycodone and Cocaine:***

              i.    that from January 2022 through July 2022, in the District of Maryland an agreement existed between two or more persons to violate the drug laws of the United States by distributing cocaine and oxycodone, a Schedule II controlled substance

              ii.    the Defendant knowingly entered into that agreement.

Rev. August 2018

***Count 3- Possession of a Firearm in Furtherance of a Drug Trafficking Crime:***

  a. That on or about the time alleged in the Indictment, in the District of Maryland, the Defendant:

  b. The Defendant committed a drug trafficking crime as charged in Count 1 of the Indictment, Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, and;

  c. That the Defendant knowingly possessed a firearm in furtherance of that crime.

Penalties

  3. The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 21 U.S.C. § 846 | 0 | 20 | 3yrs | $1,000,000 | $100 |
| 3 | 18 U.S.C. § 924(c) | 5 years | Life | 5 years | $250,000 | $100 |

  a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

  b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

  c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

  d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

  e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

  f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a

Rev. August 2018

schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

### Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

   e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the

charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

      g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

      h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

6.      This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

      a.      This Office and the Defendant further agree that the applicable base offense level for Count One is 12 pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(c)(14) to account for at least at least 20 KG but less than 40 KG of Converted Drug

Rev. August 2018

4

Weight. This Office and the Defendant further agree that, pursuant to U.S.S.G. § 2K2.4(b), the guideline sentence for Count 3 is the minimum term of imprisonment required by statute—five years' imprisonment to be run consecutive to any other sentence.

        b.     This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

       7.     There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

       8.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Obligations of the Parties

       9.     At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

Waiver of Appeal

      10.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

        a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground

that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

    b.  The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

      i.  The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

      ii.  This Office reserves the right to appeal any sentence below a statutory minimum.

    c.  The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Forfeiture

11.  The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12.  Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: a privately made firearm without a serial number designed to be fired single handedly or from the shoulder.

13.  The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14.  The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of

the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Defendant's Conduct Prior to Sentencing and Breach

16. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

17. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

18. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding

prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

19. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

*Christine Goo*

Christine Goo
Leo Wise
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

8/7/23
Date

Steven Angelini

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

8/7/23
Date

Sedira Banan
Assistant Federal Public Defender

Rev. August 2018

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

### A. ANGELINI contacts CO-CONSPIRATOR 1 to obtain cocaine

In 2006, Defendant Steven ANGELINI joined the Baltimore Police Department. By January 2022, ANGELINI had been administratively suspended and lost his police powers.

On January 6, 2022, ANGELINI reached out to CO-CONSPIRATOR 1 by text message and offered to sell him 90 "pinks" (oxycodone). The two negotiated the price for the oxycodone and ANGELINI agreed to the sell the pills for $5 apiece. During this exchange, ANGELINI mentioned that he was trying to get "dog" (cocaine). ANGELINI then stated that he had been getting his supply from "D" but that "D" was "gone." "D," a drug dealer working for CO-CONSPIRATOR 1, had in fact been murdered. ANGELINI then offered twice to go to the Baltimore City Police Department ("BPD") Homicide Unit to obtain any information about the investigation. ANGELINI agreed to give CO-CONSPIRATOR 1 90 pills oxycodone in exchange for $100 and an eighth of an ounce of cocaine ("the ball"). The next day, on January 7, 2022, at 9:15 a.m., ANGELINI sent CO-CONSPIRATOR 1 a series of text messages, updating him on the information he was able to obtain on the murder of "D." Specifically, ANGELINI told CO-CONSPIRATOR 1 that he received some information on the case and some pictures. The law enforcement sensitive information and materials ANGELINI accessed were available to BPD employees through mass email dissemination. During their conversation, CO-CONSPIRATOR 1 asked for a copy of a video of the murder obtained by BPD homicide detectives from a local business that had a camera trained on the scene of the murder. ANGELINI sent 9 photographs of his work computer screen from a cellphone to CO-CONSPIRATOR 1. In those photographs, ANGELINI captured images of BPD intelligence reports, and BPD incident reports, with details about the murder investigation, including photographs and other information pertaining to the suspect. On January 10, 2022, ANGELINI sent two texts to CO-CONSPIRATOR 1 about additional information regarding the murder of "D"

| Time | Sender | Message |
|---|---|---|
| 3:47:36 PM | ANGELINI | One thing I saw and forgot to tell u is that Baby D got out of the vehicle and someone in that vehicle then shot him . |
| 3:47:58 PM | ANGELINI | In Jeep renagade |
| 3:49:13 PM | CO-CONSPIRATOR 1 | Yeah bro I know I that I though u was going to get video and tag but it's all good get well soon. |
| 3:50:10 PM | CO-CONSPIRATOR 1 | They shot him in the truck |

Rev. August 2018

9

On January 14, 2022, ANGELINI followed up with CO-CONSPIRATOR 1 and told him that he had the video. ANGELINI did not in fact have the video, however. ANGELINI asked to meet with CO-CONSPIRATOR 1 to give him the video and to buy another "ball" (one eighth ounce of cocaine). On the same day, at approximately 7:24 p.m., CO-CONSPIRATOR 1 sent a text message to ANGELINI and said that the USB drive ANGELINI gave him was empty. ANGELINI apologized and stated he made a mistake transferring the file. He promised CO-CONSPIRATOR 1 to get him the original file. ANGELINI then suggested transferring it to CO-CONSPIRATOR 1 using Google Drive. ANGELINI never transferred a video to CO-CONSPIRATOR 1 over Google Drive On January 16, 2022, CO-CONSPIRATOR 1 sent ANGELINI a text saying that he never got it.

[handwritten annotation: Angelini never contacted the detective nor arranged to meet with him.]

On January 25, 2022, ANGELINI texted CO-CONSPIRATOR 1 and updated him about his attempts to obtain the murder video for CO-CONSPIRATOR 1. ANGELINI told CO-CONSPIRATOR 1 that he had contacted the detective who had given him the video and arranged to meet with him again. ANGELINI also promised CO-CONSPIRATOR 1 that if that didn't work, ANGELINI would go directly to the business that recorded the original video of the murder and "show them his badge." In other words, ANGELINI implied that he would, use his police powers, to obtain a copy of the video for CO-CONSPIRATOR 1. CO-CONSPIRATOR 1 reminded ANGELINI that the two had a deal and that CO-CONSPIRATOR 1 had given ANGELINI drugs because he believed ANGELINI was going to get him the video of the murder. ANGELINI's offers to obtain the video for CO-CONSPIRATOR 1 were made with the sole objective to persuade CO-CONSPIRATOR 1 to provide him with cocaine.

Following these text exchanges on January 25, 2022, the contact between ANGELINI and CO-CONSPIRATOR 1 was minimal until April 8, 2022, when ANGELINI reached out to CO-CONSPIRATOR 1 to sell him a firearm.

On April 8, 2022, ANGELINI initiated contact with CO-CONSPIRATOR 1 by text message. ANGELINI contacted CO-CONSPIRATOR 1 about the sale of a privately made firearm without a serial number designed to be fired single handedly or from the shoulder ("PMF firearm") for $300 plus a "ball" (an eighth of an ounce of cocaine) ANGELINI also offered ammunition on top of the sale of this firearm, in an attempt to make amends for the fact that ANGELINI failed to obtain the video of the murder of "D" in January.

The following are some of the text messages between the two:

| 12:55:14 PM | ANGELINI | Hey bro it's Steve ANGELINI hope u ain't still mad at me buddy . I tried everything to get the video . But anyway selling this Ar ghost for a good deal if you interested. I built and it's 9mm AR 10 inch with colt magazine . Ghost diamond sites with night sights . Let me know if u interested for a good deal .<br><br>*Two images and attached files* (gun) |
|---|---|---|
| 12:55:55 PM | CO-CONSPIRATOR 1 | How much |

Rev. August 2018

10

| 12:56:30 PM | ANGELINI | For u $300 plus a ball . U can't beat that I put $900 in it |
| --- | --- | --- |
| 12:56:51 PM | CO-CONSPIRATOR 1 | Ok yeah I take it |
| 12:56:58 PM | ANGELINI | It's yours |
| 12:57:03 PM | ANGELINI | Nice ass shit |
| 12:57:14 PM | CO-CONSPIRATOR 1 | I got three of the same ones so that's fair |
| 12:57:15 PM | ANGELINI | I put 50 rounds through it and shoots perfect |
| 12:57:51 PM | ANGELINI | Cool bro I'm glad u ain't mad at me bro . I am sorry I tried everything buddy . I swear . |
| 12:58:24 PM | ANGELINI | U want meet up later let me know . I got a red dot I will throw in for free |
| 12:58:58 PM | ANGELINI | Give u some hollows too if u need any… |

The conversation continued:

| 1:14:29 PM | ANGELINI | I will leave the colt magazine full with 30 rounds and bring u some hollow 9mm too |
| --- | --- | --- |
| 1:15:50 PM | CO-CONSPIRATOR 1 | What u mean 9mm |
| 1:16:38 PM | ANGELINI | Shoots 9mm rounds I built a 9mm Ar |
| 1:16:56 PM | CO-CONSPIRATOR 1 | Damn that's what's up |
| 1:17:05 PM | ANGELINI | Yeah way better |
| 1:17:37 PM | ANGELINI | It takes colt magazines I have 1 for u |
| 1:17:43 PM | CO-CONSPIRATOR 1 | Is that more damage you think |
| 1:17:49 PM | ANGELINI | Fucking right |
| 1:17:59 PM | ANGELINI | Plus Hollow points unbelievable |
| 1:18:31 PM | ANGELINI | Everything I put on it is best parts |
| 1:19:01 PM | ANGELINI | Plus 9mm is what everyone is going too now |
| 1:21:49 PM | ANGELINI | Just let me know what time u want me to meet u and I will bring everything buddy . |
| 1:23:44 PM | ANGELINI | I will bring in it book bag u can have . |
| 1:25:31 PM | CO-CONSPIRATOR 1 | Ok |
| 1:25:37 PM | CO-CONSPIRATOR 1 | Like 5 |
| 1:27:35 PM | ANGELINI | Sounds good bro up the bar right ? |

   At approximately 4:51 p.m., CO-CONSPIRATOR 1 and ANGELINI agreed to meet at the Coach House bar around 6:00 p.m. on the same date. At approximately 5:48 p.m., ANGELINI arrived at the rear parking lot of the Coach House. ANGELINI was observed exiting the vehicle and walking towards the rear entrance of the bar. At 6:17 p.m., ANGELINI called CO-CONSPIRATOR 1 to confirm their meeting. CO-CONSPIRATOR 1 told ANGELINI that he would meet him later but that Co-Conspirator 2 would conduct the transaction for CO-CONSPIRATOR 1. ANGELINI then explained that he took the pins out of the PMF firearm so it would fit in the bag. ANGELINI also offered to re-assemble the firearm for CO-CONSPIRATOR 1. At 6:18 p.m. ANGELINI met with Co-Conspirator 2 in the rear area of the Coach House. ANGELINI opened the trunk of his vehicle and removed a black and red backpack style bag and walked back towards the Coach House with Co-Conspirator 2. At 6:22 p.m., ANGELINI returned to his vehicle and left the parking lot. At the same time, ANGELINI called CO-CONSPIRATOR

1 and confirmed that the transaction occurred, and provided CO-CONSPIRATOR 1 with more information about the PMF firearm. He informed CO-CONSPIRATOR 1 that the night sights on the firearm were "a hundred dollars apiece." CO-CONSPIRATOR 1 then attempted to stop ANGELINI from saying more telling him, "Yeah, I can't talk on here bro."

**B.     ANGELINI provided Oxycodone to CO-CONSPIRATOR 1 for Distribution**

On April 25, 2022, at 4:40 p.m., CO-CONSPIRATOR 1 texted ANGELINI and asked him if he had any "pinks" (oxycodone) for him. ANGELINI confirmed he did texting back, "May 4th got the 7.5 can give u them for free got like 30." At approximately 5:48 p.m. CO-CONSPIRATOR 1 called ANGELINI who confirmed that he counted the pills in the bottle and had, "twenty (20) of them on me. I thought I had thirty (30) there's twenty (20). Is that alright? You still want 'em right?" CO-CONSPIRATOR 1 confirmed that he did. At approximately 6:43 p.m. ANGELINI met with CO-CONSPIRATOR 1 outside of the Coach House bar.

**C.     Angelini Purchased Ammunition and Firearm Parts for CO-CONSPIRATOR 1**

On April 26, 2022, at approximately 10:40 a.m., ANGELINI texted CO-CONSPIRATOR 1 telling him that he was at a gun shop. ANGELINI stated that he had just been paid and was trying to purchase an eighth of an ounce of cocaine from CO-CONSPIRATOR 1 and offered to purchase ammunition and various other firearm accessories for him. While ANGELINI was still in that gun shop, he and CO-CONSPIRATOR 1 discussed over the phone, the correct magazine that CO-CONSPIRATOR 1 should use for the PMF firearm that ANGELINI just sold him.

ANGELINI and CO-CONSPIRATOR 1 also discussed getting hollow-point bullets for CO-CONSPIRATOR 1. ANGELINI then confirmed with CO-CONSPIRATOR 1 that all of the items he purchased would be in exchange for an eighth of an ounce of cocaine (the ball), and ANGELINI would give CO-CONSPIRATOR 1 the remaining items to cover for the fact that ANGELINI had not provided him with the video of the murder. In total, ANGELINI spent $543.60 at the gun shop purchasing items for CO-CONSPIRATOR 1 and himself.

**D.     ANGELINI Sold Oxycodone to Co-Conspirator 1**

On May 4, 2022, ANGELINI picked up a prescription for 90 Oxycodone 10mg. pills from a Walgreens in Middle River, Maryland. At 3:22 p.m., ANGELINI called CO-CONSPIRATOR 1 and notified him that he had picked up the pills. During that conversation, ANGELINI agreed to sell CO-CONSPIRATOR 1 the oxycodone pills for $3 per pill. ANGELINI asked for $170 in cash and $100 worth of cocaine. ANGELINI dropped the distribution amount of oxycodone to Co-Conspirator 1 at the Coach House Bar, on the same day. At approximately 3:46 p.m., Co-Conspirator 1's cellphone received an incoming text message from Cash App: "Steven Angelini requested 170. Open Cash App to approve or decline."

SO STIPULATED:

*Christine Goo*
Christine Goo
Leo Wise
Assistant United States Attorneys

_____ 8/7/23
Steven Angelini
Defendant

_____ 8/7/23
Sedira Banan
Counsel for Defendant

Rev. August 2018

13