IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. ELH-22-0249 |
| | * | |
| STEVEN ANGELINI, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

******

## UNITED STATES SENTENCING MEMORANDUM

The United States of America, by undersigned counsel, hereby files the following Sentencing Memorandum in advance of the Sentencing Hearing for Mr. Angelini on June 28, 2024.

### I.     Factual Synopsis of the Crimes

In the Spring of 2022, the Baltimore County Police Department was in the midst of a large investigation into the Infamous Ryders Club, whose president was "K.D.". There were concerns about members of the Infamous Ryders Club being involved in several acts of violence, but the investigation by Baltimore County focused primarily on drug trafficking. As a part of their investigation, they wiretapped K.D.'s cellphone. In April of 2022, they discovered an unlikely drug customer: the Defendant Steven Angelini who was then a Baltimore Police Officer.

Investigators later learned that Mr. Angelini had been in contact with K.D. earlier in the year in attempts to purchase cocaine. On January 6, 2022, Mr. Angelini reached out to K.D. by text message and offered to sell him 90 "pinks" (oxycodone). The two negotiated the price for the oxycodone and Mr. Angelini agreed to the sell the pills for $5 apiece. During this exchange, Mr. Angelini mentioned that he was trying to get cocaine. Mr. Angelini then stated that he had been getting his supply from "D" but that "D" was "gone." "D," a drug dealer working for K.D.,

had in fact been murdered. Mr. Angelini then offered twice to go to the Baltimore City Police Department ("BPD") Homicide Unit to obtain any information about the investigation. Mr. Angelini agreed to give K.D. 90 pills oxycodone in exchange for $100 and an eighth of an ounce of cocaine ("the ball"). The next day, on January 7, 2022, at 9:15 a.m., Mr. Angelini sent K.D. a series of text messages, updating him on the information he was able to obtain on the murder of "D." Specifically, Mr. Angelini told K.D. that he received some information on the case and some pictures. During their conversation, K.D. asked for a copy of a video of the murder obtained by BPD homicide detectives from a local business that had a camera trained on the scene of the murder. Mr. Angelini sent 9 photographs of his work computer screen from a cellphone to K.D. In those photographs, Mr. Angelini captured images of BPD intelligence reports, and BPD incident reports, with details about the murder investigation, including photographs and other information pertaining to the suspect. On January 10, 2022, Mr. Angelini sent two texts to K.D. about additional information regarding the murder of "D":

| Time | Sender | Message |
|---|---|---|
| 3:47:36 PM | ANGELINI | One thing I saw and forgot to tell u is that Baby D got out of the vehicle and someone in that vehicle then shot him . |
| 3:47:58 PM | ANGELINI | In Jeep renagade |
| 3:49:13 PM | K.D. | Yeah bro I know I that I though u was going to get video and tag but it's all good get well soon. |
| 3:50:10 PM | K.D. | They shot him in the truck |

On January 14, 2022, Mr. Angelini followed up with K.D. and told him that he had the video. Mr. Angelini did not in fact have the video, however. Mr. Angelini asked to meet with K.D. to give him the video and to buy another "ball" (one eighth ounce of cocaine). On the same day, at approximately 7:24 p.m., K.D. sent a text message to Mr. Angelini and said that the USB drive

2

Mr. Angelini gave him was empty. Mr. Angelini apologized and stated he made a mistake transferring the file. He promised K.D. to get him the original file. Mr. Angelini then suggested transferring it to K.D. using Google Drive. Mr. Angelini never transferred a video to K.D. over Google Drive. On January 16, 2022, K.D. sent Mr. Angelini a text saying that he never got it.

On January 25, 2022, Mr. Angelini texted K.D. and updated him about his attempts to obtain the murder video. Mr. Angelini told K.D. that he had contacted the detective who had given him the video and arranged to meet with him again. Mr. Angelini also promised K.D. that if that didn't work, he would go directly to the business that recorded the original video of the murder and "show them his badge." In other words, Mr. Angelini implied that he would, use his police powers, to obtain a copy of the video. K.D. reminded Mr. Angelini that the two had a deal and that K.D.—cocaine for law enforcement information about a drug related murder. Mr. Angelini's offers to obtain the video for K.D. were made with the sole objective to persuade K.D. to provide him with cocaine.

Following these text exchanges on January 25, 2022, the contact between Mr. Angelini and K.D. was minimal until April 8, 2022, when Mr. Angelini reached out to K.D. to sell him a firearm.

On April 8, 2022, Mr. Angelini initiated contact with K.D. by text message. Mr. Angelini contacted K.D. about the sale of a privately made firearm without a serial number designed to be fired single handedly or from the shoulder ("PMF firearm") for $300 plus a "ball" (an eighth of an ounce of cocaine) and also offered ammunition on top of the sale of this firearm, in an attempt to make amends for the fact that ANGELINI failed to obtain the video of the murder of "D" in January.

The following are some of the text messages between the two:

| 12:55:14 PM | ANGELINI | Hey bro it's Steve Angelini hope u ain't still mad at me buddy . I tried everything to get the video . But anyway selling this Ar ghost for a good deal if you interested. I built and it's 9mm AR 10 inch with colt magazine . Ghost diamond sites with night sights . Let me know if u interested for a good deal .<br><br>*Two images and attached files* (gun) |
|---|---|---|
| 12:55:55 PM | K.D. | How much |
| 12:56:30 PM | ANGELINI | For u $300 plus a ball . U can't beat that I put $900 in it |
| 12:56:51 PM | K.D. | Ok yeah I take it |
| 12:56:58 PM | ANGELINI | It's yours |
| 12:57:03 PM | ANGELINI | Nice ass shit |
| 12:57:14 PM | K.D. | I got three of the same ones so that's fair |
| 12:57:15 PM | ANGELINI | I put 50 rounds through it and shoots perfect |
| 12:57:51 PM | ANGELINI | Cool bro I'm glad u ain't mad at me bro . I am sorry I tried everything buddy . I swear . |
| 12:58:24 PM | ANGELINI | U want meet up later let me know . I got a red dot I will throw in for free |
| 12:58:58 PM | ANGELINI | Give u some hollows too if u need any… |

The conversation continued:

| 1:14:29 PM | ANGELINI | I will leave the colt magazine full with 30 rounds and bring u some hollow 9mm too |
|---|---|---|
| 1:15:50 PM | K.D. | What u mean 9mm |
| 1:16:38 PM | ANGELINI | Shoots 9mm rounds I built a 9mm Ar |
| 1:16:56 PM | K.D. | Damn that's what's up |
| 1:17:05 PM | ANGELINI | Yeah way better |
| 1:17:37 PM | ANGELINI | It takes colt magazines I have 1 for u |
| 1:17:43 PM | K.D. | Is that more damage you think |
| 1:17:49 PM | ANGELINI | Fucking right |
| 1:17:59 PM | ANGELINI | Plus Hollow points unbelievable |
| 1:18:31 PM | ANGELINI | Everything I put on it is best parts |
| 1:19:01 PM | ANGELINI | Plus 9mm is what everyone is going too now |
| 1:21:49 PM | ANGELINI | Just let me know what time u want me to meet u and I will bring everything buddy . |
| 1:23:44 PM | ANGELINI | I will bring in it book bag u can have . |
| 1:25:31 PM | K.D. | Ok |
| 1:25:37 PM | K.D. | Like 5 |
| 1:27:35 PM | ANGELINI | Sounds good bro up the bar right ? |

At approximately 4:51 p.m., K.D. and Angelini agreed to meet at the Coach House bar

4

around 6:00 p.m. on the same date. At approximately 5:48 p.m., Mr. Angelini arrived at the rear parking lot of the Coach House. Mr. Angelini exited the vehicle and walking towards the rear entrance of the bar. At 6:17 p.m., Mr. Angelini called K.D. to confirm their meeting. K.D. told Mr. Angelini that he would meet him later but that Co-Conspirator 2 would conduct the transaction for K.D.. Mr. Angelini then explained that he took the pins out of the PMF firearm so it would fit in the bag. Mr. Angelini also offered to re-assemble the firearm for K.D. At 6:18 p.m. Mr. Angelini met with Co-Conspirator 2. Mr. Angelini opened the trunk of his vehicle and removed a black and red backpack style bag and walked back towards the Coach House with Co-Conspirator 2. Following the delivery of the PMF Firearm, Mr. Angelini called K.D. and confirmed that the transaction occurred, and provided K.D. with more information about the PMF firearm. He informed K.D. that the night sights on the firearm were "a hundred dollars apiece." K.D. then attempted to stop Mr. Angelini from saying more telling him, "Yeah, I can't talk on here bro."

On April 25, 2022, at 4:40 p.m., K.D. texted Mr. Angelini and asked him if he had any "pinks" (oxycodone) for him. Mr. Angelini confirmed he did texting back, "May 4th got the 7.5 can give u them for free got like 30." At approximately 5:48 p.m. K.D. called Mr. Angelini who confirmed that he counted the pills in the bottle and had, "twenty (20) of them on me. I thought I had thirty (30) there's twenty (20). Is that alright? You still want 'em right?" K.D. confirmed that he did. At approximately 6:43 p.m. Mr. Angelini met with K.D. outside of the Coach House bar.

On April 26, 2022, Mr. Angelini continued to enable K.D.'s use and possession of the PMF firearm. At approximately 10:40 a.m., Mr. Angelini texted K.D. telling him that he was at a gun shop. Mr. Angelini stated that he had just been paid and was trying to purchase an eighth of

5

an ounce of cocaine from K.D. and offered to purchase ammunition and various other firearm accessories for him. While Mr. Angelini was still in that gun shop, he and K.D. discussed over the phone, the correct magazine that K.D. should use for the PMF firearm.

Mr. Angelini and K.D. also discussed getting hollow-point bullets[1] for K.D. Mr. Angelini then confirmed with K.D. that all of the items he purchased would be in exchange for an eighth of an ounce of cocaine (the ball), and Mr. Angelini would give K.D. the remaining items to cover for the fact that Mr. Angelini had not provided him with the video of the murder. In total, Mr. Angelini spent $543.60 at the gun shop purchasing items for K.D. and himself.

On May 4, 2022, Mr. Angelini picked up a prescription for 90 Oxycodone 10mg. pills from a Walgreens in Middle River, Maryland. At 3:22 p.m., Mr. Angelini called K.D. and notified him that he had picked up the pills. During that conversation, Mr. Angelini agreed to sell K.D. the oxycodone pills for $3 per pill. Mr. Angelini asked for $170 in cash and $100 worth of cocaine. Mr. Angelini dropped the distribution amount of oxycodone to K.D. at the Coach House Bar, on the same day. At approximately 3:46 p.m., K.D.' cellphone received an incoming text message from Cash App: "Steven Angelini requested 170. Open Cash App to approve or decline."

I.  **Sentencing Guidelines Calculation**

The parties agree on the calculations that make up the sentencing guidelines here. The applicable base offense level is 12 conspiracy to distribute and possession with intent to distribute controlled dangerous substances. U.S.S.G. §2D1.1(a)(5) and §2D1.1(c)(14). *PSR* at ¶24. The Mr. Angelini has pled guilty in this matter, so the offense level decreases two levels. U.S.S.G. §3E1.1(a). The adjusted offense level is a 10.

---

[1] Hollow point bullets expand upon penetration in its target which can cause "more extensive tissue damage along the wound path." *See* https://en.wikipedia.org/wiki/Hollow-point_bullet.

## II. Sentencing Recommendation

A careful consideration of the factors found in 18 U.S.C. § 3553(a) demonstrate that a sentence of incarceration is appropriate here. Specifically, the statute directs the Court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a). Each of these factors tips in favor of a significant sentence of incarceration for the Defendant, but this memorandum will nonetheless focus on the seriousness of his offenses, the history and characteristics of the Defendant, and the need for the sentence imposed to promote deterrence, both general and specific.

### a. Factor - The Nature and Seriousness of the Offense

This Court is familiar with police officers selling drugs. *See United States v. Daniel Redd,* ELH 11-371, *United States v. Wayne Jenkins, et. al.*, GLR 17-106, *United States v. Ivo Louvado,* SAG 20-098. Mr. Angelini sold prescription pills to K.D.. A police officer selling controlled dangerous substances by itself is serious. Mr. Angelini's assist to the Infamous Ryders took it to the next level: a sworn member of law enforcement sold an untraceable firearm to a known drug trafficker and leader of a gang. K.D. was the leader of a gang, who sought to obtain information about the murder of one of its drug dealers "D". And K.D. who, thanks to Officer Angelini, had 9 photos of law enforcement sensitive information. The information that Mr. Angelini provided K.D. could only be used for a nefarious purpose.

7

Law enforcement, on a daily basis, face mounting challenges in solving murders and shootings. Despite that, Mr. Angelini made a series of decisions to make that work even more difficult for his fellow officers and detectives by placing yet another untraceable firearm into the hands of drug traffickers. But perhaps even worse, he breached the public's trust. Mr. Angelini's own employer, the Baltimore Police Department, is and continues to be under a federal Consent Decree.  The Baltimore Police Department that has an incredibly strained relationship with its community. Mr. Angelini's actions only cause further harm to the delicate trust that members of the public have in BPD.

Mr. Angelini put that weapon into K.D.'s possession where it was kept at the Infamous Ryders Clubhouse, until it was seized law enforcement.  Mr. Angelini knew at the very least that he was arming another drug trafficker, in his own community. His community where he grew up, where he had extensive friends and family, but also in the same one where he worked for many years in law enforcement.  He did not know what that firearm was going to be used for.  But he made certain that K.D. knew how to use the firearm properly, that he had the right type of ammunition, and that he had a variety of accessories to use for the firearm.  Sights to make it easier to shoot a target at night.  Hollow point bullets, designed to expand on contact and create a more expansive wound and injure major internal organs.  Instead of a drug trafficker having to obtain ammunition and gun accessories in the shadows of some sort of black market, Mr. Angelini purchased these items for him out in the open, at a gun store. He had no fear or concern about being arrested because he was a police officer with no criminal record—purchasing firearm parts for a PMF firearm he sold to the leader of a gang.

Mr. Angelini armed not only the president of a gang, but he armed the entire Infamous Ryders Clubhouse.  Mr. Angelini swore an oath in 2008 to protect and serve his community. Mr.

Angelini, a veteran officer of BPD for over ten years, was well aware of extent of the violence in the community that resulted from firearms and firearms in possession of narcotics trafficking. He received commendations for his gun arrests. But at his lowest point in 2022, he firmly placed himself on the other side of the line and sold a PMF firearm, narcotics, and law enforcement information, in exchange for cocaine. Mr. Angelini provided Mr. K.D. with clues as to who to retaliate against, the firearm, the ammunition, and a tool to make that firearm easier to shoot.

### b. Factor – History and Characteristics

Mr. Angelini has no criminal history. Unlike other Defendants that appear before this Court, the Defendant was afforded every opportunity to be successful in his life. He graduated from a reputable high school. He was raised by both of his parents and has an extensive family. Defense counsel discusses many of the difficulties that Mr. Angelini faced with his family but every family has their problems. Many of the defendants before this Court have dealt with far worse personal difficulties and challenges. As an adult he has a loving and supportive wife and daughter, and prior to his arrest they all reside in a three-bedroom house with a deck and backyard. Mr. Angelini was supported throughout his life. He was a Baltimore City Police Officer from 2008 through 2022. And unquestionably, being a police officer is a difficult and challenging job. Many officers face difficulties, personal problems, and hardship but do not resort to criminal conduct.

Instead of abiding by the oath he took as a police officer, he abused it.

### c. Factor – Need for Deterrence

It can hardly be emphasized enough that the Court should send a solemn and stern message with its sentence in this case. Most of law enforcement is trustworthy. They can be trusted to uphold the law. There are, as is this Court is keenly aware, unfortunately are members of law enforcement who take advantage of their position, abuse the public's trust, and break the laws they

9

promised to uphold. It is important that this Defendant receive an appropriately strong sentence to deter other law enforcement from engaging in criminal conduct.

### III. Conclusion

The Defendant in this case engaged in criminal conduct that placed citizens in this community in grave danger by arming a drug trafficking motorcycle gang with an untraceable firearm, ammunition, and night sights. But further, he created further fractures in the trust that the citizens have with an already challenged police department. The Defendant should be held accountable for his actions and should receive a sentence of 60 months.

Very truly yours,

Erek L. Barron
United States Attorney

By: *Christine Goo*
Christine O. Goo
Assistant United States Attorney

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of June, 2024, a copy of the foregoing opposition was served via CM/ECF to all counsel of record.

/S/ *Christine Goo*
Christine Goo
Assistant United States Attorney

10